IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2021

**STATE OF TENNESSEE v. JAMES DURAND FAVORS, III**

**Appeal from the Criminal Court for Hamilton County**
No. 308042   Thomas C. Greenholtz, Judge

_____

**No. E2020-01166-CCA-R3-CD**

_____

The Defendant-Appellant, James Durand Favors, was charged by information with four counts of aggravated domestic assault.  He entered open guilty to pleas to all four counts. Following a sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to a total effect sentence of fifteen years' incarceration to run consecutively to his sentence in two prior cases.  The sole issue raised on appeal is whether the trial court abused its discretion in denying the Defendant alternative sentencing.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Fisher Wise, Chattanooga, Tennessee, for the Defendant-Appellant, James Durand Favors, III.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Defendant and the victim, Jamiia Robinson, were "domestic partners" and "at one point cohabitated together."  Between February 28 and March 3, 2017, the Defendant assaulted the victim multiple times at his mother's house.  At the Defendant's July 2, 2019 guilty plea submission hearing, the State summarized the evidence it would have presented had the Defendant gone to trial.  With respect to Count 1, the Defendant and the victim got

into an argument that turned violent, with the Defendant "punching her[] and choking her to the point of becoming almost unconscious." With respect to Count 2, following the strangulation incident, the victim and the Defendant went back to his residence, where he lived with his mother and father, and the Defendant "took a hot metal insert off the top of a stovetop that was hot" and pressed it against the victim's arm, resulting in "serious scarring and burning[.]" With respect to Count 3, while still at the Defendant's residence, the Defendant "heated up a butter knife" and applied the heated knife to the victim's buttocks, resulting in "permanent . . . significant scarring" to her buttocks. With respect to Count 4, while still at the Defendant's residence, the Defendant "heated up a butter knife" and applied the heated knife to the victim's labia, resulting in "[third]-degree burns to her genitals." The Defendant stipulated that there was a factual basis for his guilty pleas, and he entered open guilty pleas to all four counts.

On September 3, 2019, the trial court began the Defendant's sentencing hearing to determine his sentence length and manner of service. The Defendant's presentence report was received as an exhibit, and it reflected that the Defendant had previously pleaded guilty in two other Hamilton County Criminal Court cases. The Defendant pleaded guilty to two counts of assault against police officers committed on October 11, 2014, and to one count of domestic assault and one count of false imprisonment of his previous girlfriend, Erica Thornton, committed on December 24, 2014. The Defendant was on bail for those charges when he committed the offenses in the instant case.

At the sentencing hearing, Probation and Parole Officer Kendra Versetto testified that she had prepared the Defendant's presentence report. Both the presentence report and her interview guide with her interview notes were received as exhibits. The Defendant told her that he was "not thinking logically" during the offenses. He also told her that he was "under the influence of methamphetamine" and was in a "meth-induced psychosis" at the time of the offenses but later told her that he had not used methamphetamine in three years. The Defendant reported that he had worked 50 jobs, and Officer Versetto learned from three of those employers that the Defendant was employed there for a shorter time than he reported. The Defendant also told Officer Versetto that he had a good relationship with his family and reported that he had previously had "one stay inpatient treatment at Moccasin Bend[,]" a psychiatric hospital. Officer Versetto stated that the Defendant scored a moderate risk of re-offending on the Static Risk Offender Needs Guide, Revised ("STRONG-R") assessment.

On cross-examination, Officer Versetto testified that the Defendant received a sentence to be served in the workhouse for his four previous convictions. She agreed that the Defendant had been originally charged with aggravated kidnapping, aggravated rape, domestic aggravated assault, and interference with emergency calls. Those charges were dismissed on July 2, 2019, and the Defendant pleaded guilty to the instant four counts of

aggravated domestic assault the same day. On redirect examination, Officer Versetto affirmed that the Defendant told her he took "responsibility for the aggravated domestic assault, but the burns were consensual[.]" On recross-examination, Officer Versetto stated that the Defendant reported smoking "crystal meth" for a year and subsequently "would only smoke when a girl could get it after th[at] time[.]"

Chattanooga Police Investigator Damarise Goehring testified that she was one of the two police officers that the Defendant had assaulted with respect to his previous convictions. She explained that on October 11, 2014, she responded to a "disorder with a weapon" call regarding the Defendant. When she and another officer attempted a traffic stop of the Defendant, he "immediately jumped out of the car and started approaching" her and the other officer who was accompanying her. He appeared "very angry" and refused to stop or show the officers his hands. When Investigator Goehring and the other officer attempted to put the Defendant in handcuffs, he threw her onto the ground. She then "pulled out her taser [and] tased him[,]" but the Defendant just "looked down at the taser prongs, pulled them out of his chest, threw them on the ground, and kept coming" towards the officers. The other officer also attempted to tase the Defendant and also sprayed him in the face with pepper spray, but "nothing phased him[.]" The Defendant then began striking Investigator Goehring with "[c]losed[-]fist punches[.]" The other officer jumped on the Defendant's back, and Investigator Goehring attempted to "dry stun" the Defendant with her taster. The Defendant then grabbed the taser from Investigator Goehring and went to her patrol car, where her rifle was hanging from the roof, but was unable to make entry into the car. The Defendant tried to tase Officer Goehring "multiple times[.]" Investigator Goehring and the other officer were eventually able to get the taser away from the Defendant, and other officers subsequently arrived on the scene.

Investigator Goehring agreed that she also responded to a 911 hang up call at the Defendant's residence on March 1, 2017. Dispatch informed her that the call "came in as a woman screaming that she'd be[en] sexually assaulted" and then a male caller stated that "his girlfriend was suicidal and that he was going to take her to Moccasin Bend so he d[id]n't need police" at his residence when the dispatcher called back. She explained that upon arriving at the Defendant's residence, she knocked on the front door, but there was no response. There was no vehicle at the residence, and all of the windows had cardboard covering them. Through the corner of one window, she could see a television that had a very loud volume. She knocked on the front door for "five to ten minutes" and then left the residence but returned with another officer "half an hour later[.]" No one answered the knocks on the front door, and the officers left the residence.

On cross-examination, the 911 calls were received as exhibits. Investigator Goehring clarified that the original call was the Defendant reporting that someone else had raped the victim, not a "woman screaming[.]"

Erica Thornton testified that she had dated the Defendant for approximately six months and was the victim in his previous domestic assault and false imprisonment convictions. Thornton was at her sister's residence on December 24, 2014, when the Defendant "forced her down the steps" and into his vehicle. She testified that she was unable to get away from the Defendant. The Defendant drove her to an "abandoned house" that was boarded up and "forced [her] to jump through the window to get in the house." Inside the abandoned house, the Defendant pushed and punched Thornton before forcing her to have sex with him. Thornton stated that she was in the abandoned house for "two to three hours. The Defendant then took Thornton to the hospital, but he forced her to leave the hospital when she tried to get the attention of "an officer or a nurse[.]" The Defendant took Thornton to his mother's house and forced her to remain there by taking away all phones and being "on" her. Thornton was able to leave the residence the next morning when police came to the house. On cross-examination, Thornton agreed that she had spoken with the victim once "[a] while ago" and was her friend on social media.

The victim testified that the pain the Defendant had inflicted upon her by burning her buttocks was "[e]xcruciating" and described the burn to her labia as "never-ending pain," temporarily making her unable to walk without the use of a walker. Her burns were so extensive that she had to be treated at a special burn unit in Georgia. The victim testified that during the period between February 28 and March 3, the Defendant had also "water-boarded" her, bitten her shoulder and broken the skin, whipped her with a phone charger and then urinated on her, raped her and then urinated on her, and threw her onto the outside porch naked. She remained naked on the porch until the Defendant's mother let her inside the residence. The victim was taken to the hospital after she called her parents, who subsequently called for an ambulance.

The victim stated that the assault had caused her to "go to counseling[,]" and that she had days where she "slip[ped] into a state of depression." She further explained that she now "look[ed] at the world in different ways that not all people are good people." The victim testified that she still had nightmares and "flashbacks" to the assault, which could be triggered by "anything." She also stated that she no longer enjoyed sex because she no longer had feeling in her labia. The victim explained that the police came to the Defendant's residence multiple times during the multi-day assault, but the Defendant made her hide in the attic and in the bathroom until the police stopped knocking on the front door.

On cross-examination, the victim conceded that she had also burned the Defendant, but she explained that he forced her to because he "felt that everything would get better" if she did to him what he had done to her. She also agreed that she had tested positive for

- 4 -

amphetamine and opioids at the hospital.  She explained that the amphetamine was from the Defendant twice forcing her to drink his urine, and the opioids were because he "got some painkillers out of his mom's room" and had her take them because she was in so much pain "after he beat [her.]"  The victim testified that although the Defendant had called 911, she was too frightened to ask for help, and he told her not tell the 911 dispatcher what he had done to her.  The victim's medical records were received as an exhibit.

Devon Langley testified that she was a nurse in the emergency room at the hospital that the victim was originally brought to before being transferred to Georgia.  Langley stated that the victim had bruising to both eye orbitals, reddened corneas and sclerae, edema, facial swelling, and contusions.  The victim appeared scared, withdrawn, tearful, and was "in a lot of pain."  Langley testified that the victim also had "third[-]degree burns" to her labia minor and more burning to her labia major.  She explained that visually, the labia looked like a "a blistering[-]-type sunburn . . . where the blister had popped" with clear fluid, reddening, and "lots of edema, swelling."  The victim's medical team became "concerned that . . . the swelling was so severe" that she would not be able to urinate, so they had to insert a catheter.  The victim was "in a great deal of pain" after the catheter was placed, even after receiving morphine.  Langley also noticed a bite mark on the victim's back that had broken the skin.  She stated that the victim did not "say a whole lot" while in her care but was "very thankful" for the care that her team provided.  Langley explained that the victim was transferred to the burn center in Georgia because there was not a local burn unit that could have taken care of the victim's injures.  On cross-examination, Langley testified that the hospital did not administer amphetamine to the victim but did administer opioids.

Misty Miller testified that she was the victim's primary nurse in the emergency room before she was transferred to Georgia.  Miller stated that the victim's injuries included two black eyes, scratches to her face, bruises to both legs, a second-degree burn on her left arm, a burn on her left buttock, a bite mark on her back, and a "very severe burn to her vaginal area."  She said the victim appeared depressed and scared.  She reiterated that the burn to the victim's labia was "very painful[.]"  Miller testified that the victim was brought to the emergency room "at 3 or 4 in the morning[.]"  As part of her duties as the victim's primary nurse, Miller placed her catheter, administered pain medication and antibiotics, and administered a tetanus shot because of "the hot metal that was used to inflict the burns."  On cross-examination, Miller agreed that the victim had denied any sexual abuse when asked.

The Defendant called Z.D.[1] as its witness.  She testified that she was the Defendant's niece and was thirteen years old at the time of the sentencing hearing.  She stated that she and her sister were asleep at the Defendant's residence, her grandmother's home, when

---

[1] It is the policy of this court to refer to minor witnesses by their initials only.

they began knocking on the front door, and the victim came in their room and "told [them] to go in the bathroom[.]" She stated the victim would not let her, her sister, and the Defendant leave the bathroom until the police stopped knocking on the door. On cross-examination, she stated that the police knocked on the door for "[m]aybe like five minutes[,]" and the victim remained in the bathroom with them during that time. Z.D. explained that her grandmother was not at the residence when this occurred. She stated that the victim appeared "normal" the next day.

R.T., the Defendant's witness, testified that she was the Defendant's niece and Z.D.'s sister. She was ten years old at the time of the sentencing hearing. R.T. stated that she and Z.D. were asleep, when the police began knocking on the front door, and the victim came into their room and had them hide in the bathroom with her and the Defendant. She said that the victim told them to stay quiet and "peeked out a few times to see if they were gone." R.T. testified that they were in the bathroom for approximately ten minutes. She explained that she did not know if the victim "wanted [them] to" hide in the bathroom, but she was "the one who told [them] to." On cross-examination, she stated that the Defendant seemed "stressed" and the victim seemed "nervous" while they were in the bathroom. She did not remember seeing any bruises on the victim.

Angela Sise, the Defendant's witness, testified that she was the Defendant's mother and Z.D. and R.T.'s grandmother. She stated that the victim began living with them "around Valentine's" Day in 2017. Sise identified pictures of her residence and her stove, which were received as exhibits. She agreed that her duplex was "tight quarters[.]" Sise testified that he never heard the victim screaming but did hear her "yelling" and she and the Defendant "arguing[.]" She said that around the time of the assault, she "had to take time off work" because her father was in the hospital. Sise said that she would call to check in on the Defendant and her granddaughters "more than once" a day during February 28 to March 3, 2017. She said that she saw the victim and the Defendant "l[]ying on the couch together" on March 2, 2017, and she did not see bruises on the victim. She denied ever seeing the victim "naked on the porch[.]" Sise affirmed that she told the Defendant she was going to call the police in the early morning hours of March 3, 2017, after hearing the victim and the Defendant arguing.

On cross-examination, Sise stated she did not know that the Defendant was using methamphetamine during the period in question. She stated neither the Defendant nor the victim had a vehicle. She identified the victim in the previously-admitted photographs of the victim's injuries, but Sise stated that the victim looked "normal" when she last saw her on March 3, 2017.

The Defendant did not testify on his own behalf at the sentencing hearing, but made an allocution, stating

Your Honor, I sincerely apologize to Ms. Robinson's family and those affected by this case in her family. We were smoking a lot of methamphetamine at the time. I thought we were bonding, branding each other consensually. If she would have told me at any given moment, no, stop, I would have stopped immediately.

At the time, I thought it was a bonding ritual. Now I know that it was not. And I truly regret it every day of my life. And I pray for the best to Jamiia Robinson's family and her moving forward in live with the pursuit of happiness. May she do well. Thank you, Your Honor.

The trial court continued the sentencing hearing so that it could fairly review all of the submitted evidence. Thereafter, the Defendant moved to reopen the proof with respect to sentencing, alleging that Thornton had testified inconsistently at the sentencing hearing and a previous preliminary hearing. Thornton was not at the hearing on the motion, and the Defendant requested a reset on the hearing so that he could subpoena her. Thornton was not at the reset hearing, and the trial court again reset the hearing on the motion for March 6, 2020. Thornton again did not appear, and she was ordered to appear April 2, 2020, to show cause why she should not be held in contempt of court. She apparently did not appear on April 2, 2020. On August 6, 2020, the trial court entered a fifty-four-page "Sentencing Order and Findings of Fact[,]" with nineteen pages dedicated to "Service of Sentence: Alternative Sentencing Considerations[.]"[2]

In the written sentencing memorandum, the trial court noted that it had considered all of the information presented at the sentencing hearing, including the presentence report, other evidence and exhibits,[3] statistical information from the Administrative Office of the Courts, the evidence presented by both parties on the mitigating and enhancement factors, the statements made by the Defendant in his allocution and in the presentence report, the statements made by the victim at the sentencing hearing, the principles of sentencing, the nature and characteristics of the crime, and the arguments made regarding sentencing alternatives. In denying alternative sentencing, the trial court explicitly considered the factors "pursuant to Tennessee Code Annotated sections 40-35-103 and -210(b)[.]" Following extensive discussion of each of the relevant factors, the trial court found that the following factors weighed against granting the Defendant alternative sentencing: the

---

[2] The trial court explained that it entered the written memorandum in an attempt to minimize its in-person proceedings amidst the COVID-19 pandemic.

[3] The trial court noted that because Thornton never appeared, the parties provided a recording of her previous preliminary hearing testimony to the trial court for its review.

Defendant's character, history, and background; the Defendant's amenability to rehabilitation; the Defendant's criminal history and behavior; and the nature and circumstances of the offense. The court afforded "heavy weight" to the nature and circumstances of the offense and the Defendant's criminal history, "moderate weight" to the Defendant's amenability to rehabilitation, "light to moderate weight" to the Defendant's character, history, and background, and "no weight" for or against alternative sentencing with respect to considerations of deterrence. The court found no factors weighed in favor of granting the Defendant alternative sentencing.

## ANALYSIS

The Defendant contends that the trial court erred in denying alternative sentencing because the Defendant is a Range I offender who "had not been convicted of three o[r] more felonies involving separate periods of incarceration[,]" and "the offense is not one for which probation is prohibited." The State responds that the trial court "acted consistently with the purposes and principles of the Sentencing Act and properly exercised its discretion in denying the [D]efendant an alternative sentence to incarceration." We agree with the State.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(5) gives courts guidance regarding the types of defendants who should be required to serve their sentences in confinement:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

Tenn. Code Ann. § 40-35-102(5).

In addition, Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to

the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Id. § 40-35-102(6)(D).

A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments.

A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for

full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. (citing Tenn. Code Ann. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. See Tenn. Code Ann. § 40-35-303(a). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would "'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Further, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" Id. § 40-35-103(5). Moreover, our supreme court has held that truthfulness is a factor which the court may consider in deciding whether to grant or deny probation. Bunch, 646 S.W.2d at 160 (citing State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981)).

In the instant case, the trial court made the required findings on the record in denying the Defendant an alternative sentence. The trial court reviewed the presentence report and all of the evidence presented at the sentencing hearing and made extensive findings of fact in determining that the Defendant was not a good candidate for an alternative sentence. The Defendant had four recent prior convictions, including three for assault. The trial court also noted the "cruel and sadistic" nature and circumstances of the instant offenses that occurred over a three-day period. The court also found that the Defendant was not amenable to rehabilitation as he had "repeatedly engaged in criminal behavior while on pretrial release for previous offenses." The trial court concluded that the Defendant had a long history of substance abuse, noting that the instant offenses were related

methamphetamine use. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, we affirm the trial court's denial of an alternative sentence.

## **CONCLUSION**

Based on the analysis above, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE